UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GRACIE WADER, | ) | Case No. 09-CV-01534-AJB (JMA) |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF UNITED STATES MAGISTRATE** |
| v. | ) | **JUDGE RE PLAINTIFF'S MOTION** |
| | ) | **FOR SUMMARY JUDGMENT [DOC.** |
| MICHAEL J. ASTRUE, Commissioner of | ) | **17] AND DEFENDANT'S CROSS-** |
| Social Security, | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | **[DOC. 20]** |
| Defendant. | ) | |
| | ) | |

Plaintiff Gracie Wader ("Plaintiff") seeks judicial review of Defendant Social

Security Commissioner Michael J. Astrue's ("Defendant") determination that she is not

entitled to supplemental security income benefits.  Plaintiff has filed a Motion for

Summary Judgment and Defendant has filed a Cross-Motion for Summary Judgment.

For the reasons set forth below, the Court recommends Plaintiff's motion be **GRANTED**

**IN PART** and **DENIED IN PART**, Defendant's cross-motion for summary judgment be

**GRANTED IN PART** and **DENIED IN PART**, and the case be remanded for further

proceedings.

//

//

**I. PROCEDURAL HISTORY**

Plaintiff filed an application for Social Security Disability Insurance ("SSDI") benefits on January 26, 2006[1] alleging a disability onset date of July 1, 2005.  (Admin. R. at 114-19.)  Plaintiff's disability claim was denied initially on June 23, 2006 and again upon reconsideration on February 13, 2007.  (Id. at 60, 65.)  On March 29, 2007, Plaintiff protectively filed an application for Supplemental Security Income ("SSI") benefits.  (Id. at 120-23.)  Plaintiff also requested a hearing before an Administrative Law Judge ("ALJ").  (Id. at 72.)  An administrative hearing was conducted on May 14, 2008 by ALJ Bernard A. Trembly.  (Id. at 13, 24.)  The hearing was continued because a large number of medical records had not been made available to the medical expert prior to the hearing.  (Id. at 13, 24-27.)  A second administrative hearing was conducted on July 23, 2008 by ALJ James S. Carletti, who determined Plaintiff was not disabled.  (Id. at 10-21, 30.)  Plaintiff requested a review of the ALJ's decision on November 26, 2008.  (Id. at 205-08.)  The Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review on January 9, 2009.  (Id. at 5-8.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).[2]

**II. FACTUAL BACKGROUND**

Plaintiff was born on September 21, 1958.  (Id. at 114.)  Plaintiff graduated from high school and worked as a psychiatric technician and unit supervisor from 1992 until 2001.  (Id. at 33-34, 167.)  Plaintiff then cared for her terminally ill mother until her death on December 31, 2004.  (Id. at 35.)  Plaintiff has never been married but has one adult child, Joseph Wader.  (Id. at 151.)  Plaintiff alleges disability due to major depression, panic and anxiety attacks, and post traumatic stress disorder ("PTSD").  (Id. at 38.)

---

[1] The record reflects two different filing dates for the SSDI application, January 13, 2006, and January 26, 2006.  (Admin. R. at 13, 114.)  This opinion reflects the date listed on the application Plaintiff filed with the SSA.  (Id. at 114-19.)

[2] Plaintiff allegedly reapplied for SSI benefits and was approved effective May 1, 2009.  (Doc. No. 17, p. 8.)  Plaintiff, however, provides no support in the record regarding her second application or subsequent approval.  Regardless, the period under review by this Court is from July 1, 2005, Plaintiff's alleged onset date, to September 29, 2008, the date of the ALJ's decision.  (Doc. No. 20, p. 1.)

**III.  MEDICAL EVIDENCE**

**A.    Melvin Saud, M.D., Riverside Mental Health Facility, Treating Physician (2005)**

Plaintiff was admitted into the Riverside Mental Health facility on June 28, 2005 claiming severe depression and suicidal thoughts.  (Id. at 213.)  On admission, Plaintiff was seen by Melvin Saud, M.D., who indicated Plaintiff had a depressed mood, poor judgment, and poor concentration and attention, but fair memory and intact language abilities.  (Id. at 213-14.)  Dr. Saud noted Plaintiff displayed symptoms of alcohol and drug withdrawal and referred her to a drug and alcohol rehabilitation program.  (Id. at 214.)  After seven days of treatment, Plaintiff was discharged on July 6, 2005, with a Global Assessment of Functioning ("GAF") score of 60,[3] which indicates "[m]oderate symptoms."  (Id. at 213-14.)  Upon discharge, Dr. Saud indicated Plaintiff was alert and oriented and had a neutral mood, fair judgment, and no suicidal ideation.  (Id. at 214.)  Dr. Saud gave Plaintiff a fair prognosis "if the patient takes the medication as prescribed and refrains from use of illicit drugs and alcohol."  (Id. at 214.)

**B.    San Diego County Psychiatric Hospital, Treating Physicians (2005)**

Plaintiff was first seen in the San Diego County Psychiatric Hospital on June 18, 2005 when she requested medication for depression.  (Id. at 246.)  Plaintiff attributed her depression to the death of her mother in 2004.  (Id.)  Plaintiff returned in July for more medication, but tested positive for methamphetamine, admitted to continued marijuana and amphetamine use, and was sent to a crisis house.  (Id. at 242, 246-47.)  On November 17, 2005, Plaintiff returned to the San Diego County Psychiatric Hospital, Emergency Psychiatric Unit.  (Id. at 239.)  Plaintiff was admitted into the San Diego County Psychiatric Hospital on November 18, 2005 for suicidal ideation and depression.  (Id.)  On admission, Plaintiff tested positive for tetrahydrocannabinol ("THC") and

---

[3] A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV), 32.

1  admitted to using methamphetamine the day before because "she wanted to feel

2  better."  (Id. at 244.)

3      Plaintiff was treated by various staff psychiatrists between November 18, 2005

4  and November 23, 2005.  (Id. at 239-59.)  On admission, staff psychiatrist Young Ho

5  Kang, M.D., noted Plaintiff talked about wanting to die, but had no actual plan for

6  suicide.  (Id. at 242-43.)  A later assessment by staff psychiatrist Robert Bloomgarden,

7  M.D., indicated Plaintiff was extremely depressed and somewhat anxious, with suicidal

8  plans "for overdose or walking in front of a bus or trolley."  (Id. at 248-49.)  Dr.

9  Bloomgarden ordered Plaintiff admitted to the Crisis Recovery Unit.  (Id. at 249.)

10      In the Crisis Recovery Unit, Plaintiff was seen by staff psychiatrist Harold Konia,

11  M.D., who observed that Plaintiff "avoided eye contact" and "exhibited fidgety hand

12  movements and repeatedly stroked her hair while being interviewed."  (Id. at 252.)

13  Plaintiff was also examined by staff physician Bruce Penvey, M.D., who noted Plaintiff's

14  diabetic condition along with her depressed mood and affect.  (Id. at 255.)  Plaintiff's

15  discharge diagnosis was Major Depressive Disorder, recurrent and moderate, and

16  Cannabis Dependence.  (Id. at 240.)  At the time of discharge, staff psychiatrist Kenneth

17  L. Campos, M.D., assigned Plaintiff a GAF of 35,[4] which indicates "some impairment."

18  (Id. at 239-41.)  Plaintiff had no suicidal ideation, displayed dysphoric affect and sad

19  mood, but had fair insight and judgment.  (Id. at 240.)

20  **C.  New Vistas, County of San Diego, Mental Health Services, Treating**

21          **Physicians (2005)**

22      Plaintiff was then referred to New Vistas, County of San Diego, Mental Health

23  Services, where she received inpatient treatment from November 23, 2005 through

24  December 11, 2005.  (Id. at 261-76.)  On admission, Plaintiff was oriented to her current

25

26      [4] A GAF of 31-40 indicates "[s]ome impairment in reality testing or
   communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major
27  impairment in several areas, such as work or school, family relations, judgment,
   thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable
28  to work; child frequently beats up younger children, is defiant at home, and is failing at
   school)."  (DSM-IV), 32.

situation, the day, month and year, and presented with depressed and anxious mood and flat affect.  (Id. at 262, 268.)  Upon discharge, Plaintiff was diagnosed with Diabetes, Depressive Disorder, and Amphetamine and Cannabis Dependence.  (Id. at 270-71.)

**D.    Downtown Mental Health Center, County of San Diego, Mental Health Services, Treating Physicians (2006-2008)**

From January 4, 2006 through May 9, 2008, Plaintiff intermittently received treatment at the Downtown Mental Health Center.  (Id. at 278-301, 347-59, 365-75, 383-440, 511-18.)  Plaintiff first presented for treatment at the Downtown Mental Health Center with depressed mood on January 4, 2006.  (Id. at 278-87.)  On admission, Plaintiff indicated she had daily social interactions with her family and participated in some recreation with others.  (Id. at 278.)  Plaintiff was taking care of her personal needs, keeping appointments, doing housekeeping, laundry, shopping, and talking on the phone.  (Id.)  Plaintiff was diagnosed with Major Depressive Disorder, recurrent and severe, Panic Disorder with Agoraphobia, Diabetes, High Blood Pressure, and Arthritis. (Id. at 283.)  Upon discharge, Plaintiff was assigned a GAF of 50.[5]  (Id.)  For the next two years, Plaintiff received outpatient treatment from various physicians for diabetes and other health concerns, including psychiatric symptoms of depressed mood, inability to sleep, and panic attacks.  (Id. at 278-301, 347-59, 365-75, 383-440, 511-18.)

**1.    Mounir Soliman, M.D., Treating Physician (2006)**

On June 14, 2006, Mounir Soliman, M.D., provided outpatient treatment to Plaintiff.  (Id. at 344-46.)  Dr. Soliman prescribed medication for Plaintiff's diabetes and depression.  (Id.)

/ /

/ /

---

[5] A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  (DSM-IV), 32.

09cv01534

### 2.     Mark Zink, M.D., Treating Psychiatrist (2006)

On July 31, 2006, Mark Zink, M.D., completed a Psychiatric Review Form concerning Plaintiff's impairments.  (Id. at 361-64.)  Dr. Zink diagnosed Plaintiff with Major Depressive Disorder, Recurrent and Severe, without psychotic features, and Methamphetamine Dependence in full Remission.  (Id. at 361.)  Dr. Zink found Plaintiff had moderate limitations in activities of daily living, moderate limitations in social functioning, moderate limitations in maintaining concentration, persistence, or pace, and one or two repeated episodes of decompensation of extended duration.  (Id. at 364.)  Dr. Zink concluded Plaintiff would likely be absent from work more than three times a month due to her impairments, and "[s]econdary to severity of depression, and frequent panic attacks, [Plaintiff] may not be able to function even on a part-time basis."  (Id. at 363.)  Dr. Zink assigned Plaintiff a GAF of 40.[6]  (Id. at 361.)

Dr. Zink explained the clinic findings supporting the severity of Plaintiff's mental impairments and symptoms were her "severe depressed mood and insomnia" and "severe anxiety with occasional panic attacks."  (Id. at 362.)  Dr. Zink indicated Plaintiff's treatment response was slow with slight improvement in mood and that Plaintiff is currently homeless as a result of her disorder.  (Id.)  Dr. Zink gave Plaintiff a good prognosis with continued treatment if she could find permanent housing.  (Id. at 363.)

### 3.     Shannon V. Chavez, M.D., Treating Psychiatrist (2007)

On February 21, 2007, Shannon V. Chavez, M.D., completed a Psychiatric Review Form concerning Plaintiff's impairments.  (Id. at 389-92.)  Dr. Chavez diagnosed Plaintiff with Panic Attacks with Agoraphobia and Dependency Traits.  (Id.)  Dr. Chavez also found Plaintiff had no restrictions in activities of daily living, extreme difficulties in maintaining social functioning, moderate to marked difficulties in maintaining concentration, persistence, and pace, and one or two episodes of decompensation, specifically referring to her psychiatric hospitalizations.  (Id. at 392.)  Dr. Chavez concluded Plaintiff would likely be absent from work more than three times a month due

---

[6] See supra, note 4, for GAF of 31-40.

1 | to her impairments and would have difficulty working at a regular job on a

2 | sustained basis for fear of having panic attacks or excessive mood disturbance.  (Id. at

3 | 391.)  Dr. Chavez assigned Plaintiff a GAF of 50.[7]  (Id. at 389.)

4 |        Dr. Chavez explained the clinic findings supporting the severity of Plaintiff's

5 | mental impairments were her impaired concentration, psychomotor agitation and

6 | repetitive motions, anxious mood, blunted affect, and occasional suicidal ideation.  (Id.

7 | at 390.)  Dr. Chavez indicated Plaintiff was oriented with cognition intact and had

8 | experienced a decrease in the frequency of panic attacks and mood swings in response

9 | to medical management treatment.  (Id.)

10 |     **4.**    **Alexander Papp, M.D., Jane Westin Wellness and Recovery Center,[8]**

11 |            **Treating Psychiatrist (2007-2008)**

12 |        On May 9, 2008, Alexander Papp, M.D., completed a Psychiatric Review Form

13 | concerning Plaintiff's impairments.  (Id. at 515-18.)  Dr. Papp indicated he saw Plaintiff

14 | every five weeks for thirty minutes and diagnosed Plaintiff with Panic Disorder with

15 | Agoraphobia.  (Id. at 515.)  Dr. Papp concluded Plaintiff had moderate limitations in

16 | activities of daily living, marked limitations in social functioning, marked limitations in

17 | maintaining concentration, persistence, or pace, and no repeated episodes of

18 | decompensation of extended duration.  (Id. at 518.)  However, Dr. Papp noted even a

19 | minimal increase in mental demands or any change in environment would be predicted

20 | to cause Plaintiff to decompensate.  (Id.)  Dr. Papp indicated Plaintiff would likely be

21 | absent from work more than three times a month due to her "irrational fears of having

22 | panic attacks, severe anxiety, [and] fear of interacting with others."  (Id. at 517.)  Dr.

23 | Papp assigned Plaintiff a GAF of 45.[9]  (Id. at 515.)

24 | / /

---

26 |    [7] See supra, note 5, for GAF of 41-50.

27 |    [8] The Downtown Family Health Center changed its name to the Jane Westin
28 | Wellness and Recovery Center in 2007.  (Id. at 393.)

   [9] See supra, note 5, for GAF of 41-50.

09cv01534

1    Dr. Papp explained the clinic findings supporting the severity of Plaintiff's mental

2    impairments and symptoms were her "depressed mood, flat affect, panic attacks and

3    agoraphobia." (Id. at 516.)  Dr. Papp also noted Plaintiff was stabilized on medication,

4    but her response to treatment was inconsistent.  (Id.)

5    **E.      E.P. O'Malley, M.D., Social Security Administration, Non-Examining**

6    **         Psychiatrist (2006)**

7    On March 22, 2006, state agency psychiatrist E.P. O'Malley, M.D., completed a

8    Psychiatric Review Technique Form[10] concerning Plaintiff's impairments.  (Id. at 302-

9    15.)  There is no indication Dr. O'Malley conducted an examination of Plaintiff.  Dr.

10   O'Malley opined Plaintiff's diagnosis was Adjustment Disorder, which is an affective

11   disorder, and Polysubstance and Alcohol Abuse, which is a substance addiction

12   disorder.  (Id. at 302, 305, 310.)  Dr. O'Malley also found Plaintiff has mild restrictions in

13   activities of daily living, moderate difficulties in maintaining social functioning, mild

14   difficulties in maintaining concentration, persistence, and pace, and no episodes of

15   decompensation.  (Id. at 312.)  Dr. O'Malley concluded Plaintiff would be moderately

16   limited in handling detailed instructions and interacting with the general public, but would

17   not otherwise be limited.  (Id. at 316-17.)  Dr. O'Malley did not provide a residual

18   functional capacity assessment of Plaintiff.  (Id. at 317-18.)

19   **F.      Luisa B. Fijman, M.D., Seagate Medical Group, Examining Psychiatrist**

20   **         (2006)**

21   Plaintiff underwent a comprehensive psychiatric evaluation with Luisa B. Fijman,

22   M.D., a Board certified psychiatrist, on May 16, 2006.  (Id. at 320-25.)  Plaintiff reported

23   a history of polysubstance dependence, both marijuana and methamphetamine, dating

24   back to 1985.  (Id. at 320-21.)  Plaintiff stated she had been living at the YMCA since

25   April 11, 2006 and lived in homeless shelters before that time.  (Id. at 321.)  She was

26

27

28   [10]  The Psychiatric Review Technique Form is separate and distinct from the
     Psychiatric Review Form completed by Drs. Zink, Chavez, and Papp.

1   able to participate in all household chores at the YMCA, including cooking, cleaning,

2   and laundry.  (Id. at 322.)  She also went shopping, ran errands, and drove.  (Id.)

3   Plaintiff told Dr. Fijman she worked as a licensed Psychiatric Technician for fifteen years

4   and stopped working in June 2001 to care for her ailing mother who passed away in

5   2004.  (Id. at 322.)

6        Plaintiff's mental status examination revealed: (1) a neat appearance and

7   cooperative attitude with no evidence Plaintiff was under the influence of drugs or

8   alcohol; (2) a coherent and organized thought process; (3) relevant and non-delusional

9   thought content; (4) depressed mood and congruent affect; (5) organized speech; (6)

10   alert and oriented attention; and (7) ability to perform memory and concentration testing.

11   (Id. at 322-24.)  Dr. Fijman diagnosed Plaintiff as Polysubstance Dependent, with Mood

12   Disorder secondary to Polysubstance Dependence.  (Id. at 324.)  Dr. Fijman concluded

13   "claimant has no functional limitations from a psychiatric standpoint" and assigned

14   Plaintiff a GAF score of 55-68.[11]  (Id. at 324-25.)

15   **G.   Emad Tadros, M.D., Scripps Mercy Hospital, Treating Physician (2006)**

16        Later that same day, on May 16, 2006, Plaintiff was admitted to Scripps Mercy

17   Hospital for depression and suicidal ideation with a GAF of 20.[12]  (Id. at 328, 330.)

18   Plaintiff stated she had been evicted from the YMCA that day without notice because

19   she failed her random drug test.  (Id. at 334.)  Plaintiff's mental status exam revealed

20   remarkably decreased energy level, severely dysphoric mood, markedly restricted

21   affect, positive preoccupation with suicide, and marginal insight and judgment.  (Id. at

22   335.)  Plaintiff was diagnosed with Schizoaffective Disorder, most recently depressed,

23

24       [11] See supra, note 3, for GAF of 51-60.  A GAF of 61-70 indicates "[s]ome mild
25   symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social,
   occupational, or school functioning (e.g., occasional truancy or theft within the
26   household, but generally functioning pretty well, has some meaningful interpersonal
   relationships)."  DSM-IV, 32.

27       [12] A GAF of 11-20 indicates "[s]ome danger of hurting self or others (e.g., suicide
28   attempts without clear expectation of death; frequently violent; manic excitement) OR
   occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross
   impairment in communication (e.g., largely incoherent or mute)."  DSM-IV, 32.

1   and was discharged on May 31, 2006 with a GAF of 50.[13]  (Id. at 328.)  Upon discharge,

2   Plaintiff reported feeling less depressed and no longer displayed significant distress or

3   suicidal ideation.  (Id. at 339.)  Dr. Tadros noted, however, Plaintiff "does appear to

4   have stabilized fairly quickly."  (Id. at 338.)

5   **H.    Isis Center, Treating Psychiatrists (2006)**

6          Plaintiff was then sent to the Isis Center to receive inpatient treatment from May

7   31, 2006 through June 15, 2006.  (Id. at 441-55.)  Plaintiff was admitted for depression

8   and for her recent relapse of amphetamine use.  (Id. at 441.)  On admission, Plaintiff

9   displayed labile affect, depressed and anxious mood, normal memory, poor judgment,

10  and adequate insight.  (Id. at 444.)  Plaintiff was diagnosed with Depressive Disorder,

11  not otherwise specified, and Amphetamine and Marijuana Dependence.  (Id. at 445.)

12  The treating psychiatrists noted Plaintiff's last use of methamphetamine was on May 14,

13  2006, after having been clean for four months.  (Id. at 454.)  Plaintiff's discharge

14  summary indicated Plaintiff had responded well to medication, but her prognosis was

15  "extremely guarded" without access to housing, funding, or support for drug

16  rehabilitation.  (Id. at 442.)   Upon discharge, Plaintiff was assigned a GAF of 31.[14]  (Id.

17  at 441.)

18  **I.    B.A. Smith, M.D., Social Security Administration, Non-Examining**

19         **Psychiatrist (2007)**

20         On February 5, 2007, state agency psychiatrist B.A. Smith, M.D., reviewed

21  Plaintiff's medical records and determined Plaintiff was "capable of unskilled repetitive

22  tasks in a non public environment."  (Id. at 376-77.)

23  **J.    Charles N. Rudolph, M.D., Treating Physician (2007-2008)**

24         Plaintiff was treated by Charles N. Rudolph, M.D., from November 8, 2007

25  through February 4, 2008.  (Id. at 456-457.)  Dr. Rudolph diagnosed Plaintiff with

26  moderately severe bilateral carpal tunnel syndrome.  (Id. at 456-457.)  Dr. Rudolph also

27

28

[13] See supra, note 5, for GAF of 41-50.

[14] See supra, note 4, for GAF of 31-40.

09cv01534

prescribed bilateral wrist splints and indicated Plaintiff received relief from the splints.

(Id. at 456.)  On February 4, 2008, Dr. Rudolph observed "crepitation present in both

hands consistent with osteoarthritis" with symptoms of carpal tunnel present, but

resolving.  (Id. at 457.)

**K.    Various Treatment Facilities (2006-2008)**

Plaintiff received outpatient treatment from various treatment facilities between

April 24, 2006 and June 6, 2008.  Plaintiff received treatment from the San Diego Family

Care facility from April 24, 2006 through April 30, 2008 for general wellness visits,

including flu shots, pap smears, and mammogram tests and results.  (Id. at 458-510,

522-25.)  Plaintiff also received treatment from the Linda Vista Specialty Clinic from

December 21, 2007 through January 18, 2008 for glaucoma.  (Id. at 519-21.)  Finally,

Plaintiff received treatment from UCSD Outpatient Psychiatric Services from May 23,

2008 through June 6, 2008.  (Id. at 526-37.)  Plaintiff indicated at the administrative

hearing that San Diego County Mental Health referred her to Downtown Mental Health,

which later became the Jane Westin Wellness and Recovery Center, who then referred

her to the Gifford Clinic at UCSD because "they [Downtown Mental Health] could not

provide the services [Plaintiff] needed."  (Id. at 35-36.)

**L.    Son's Third Party Evidence (2006)**

On February 22, 2006, Plaintiff's son, Joseph Wader, completed a Third Party

SSA Function Report.  (Id. at 151-58.)  Mr. Wader wrote Plaintiff "eats, panics, worries,

crys (sic), rock, sweat, pace, wanders, walks" from the time she wakes up until she

goes to bed.  (Id. at 151.)  Mr. Wader noted Plaintiff could not go out alone, was unable

to sleep through the night, and required verbal reminders to take care of her personal

needs.  (Id. at 152-53.)  Plaintiff also could not remember dates, keep records, or follow

directions well and could only pay attention for short periods of time.  (Id. at 154, 156.)

Mr. Wader indicated Plaintiff could not handle stress at all, had trouble completing tasks

and needed encouragement to stay on task.  (Id. at 156-58.)  Mr. Wader attributed

Plaintiff's "fear of others and the outside" as the main reason Plaintiff could not meet her

daily needs.  (Id. at 158.)  However, Mr. Wader indicated Plaintiff could prepare

simple meals, wash dishes, do laundry, sweep, shop for food and clothes, read, watch

television and movies, and spend time with friends and family.  (Id. at 153-55.)

**IV.  THE ADMINISTRATIVE HEARING**

ALJ Bernard A. Trembly conducted the first administrative hearing on May 14,

2008.  (Id. at 13, 22.)  The hearing was continued because a large number of medical

records had not been made available to the medical expert prior to the hearing.  (Id. at

24-27.)  The medical expert had received exhibits 1F through 16F prior to the hearing,

but had not received exhibits 17F through 27F until after the hearing began.  (Id. at 25-

27.)  After the remainder of the medical records were made available for review to the

medical expert, ALJ James S. Carletti conducted the second administrative hearing on

July 23, 2008.  (Id. at 10-21, 30.)

**A.     Plaintiff's Testimony**

Plaintiff testified at the hearing on July 23, 2008.  (Id. at 33-44.)  Plaintiff stated

she was forty-nine years old, had fourteen years of education, received training as a

psychiatric technician, and worked as a psychiatric technician until 2001.  (Id. at 33-34.)

She testified she cared for her mother from 2001 until her passing in late 2004.  (Id. at

35.)  Plaintiff was "kicked out" of her home by her brother and became homeless on July

1, 2005.  (Id. at 34.)  Plaintiff indicated she received treatment from County Medical

Health, the Jane Westin Clinic, the UCSD Gifford Clinic, and the Tellfer Clinic.  (Id. at

35-36, 42.)  She testified that when she complies with her prescribed medications, her

psychiatric condition improves.[15]  (Id. at 36.)  However, Plaintiff indicated she still suffers

from physical problems of uncontrolled diabetes, due to her living situation, and

glaucoma.  (Id. at 37.)  Plaintiff testified that diabetes and glaucoma were the only

physical problems that would keep her from doing some kind or all kinds of work.  (Id.)

Plaintiff also stated she last used methamphetamine on May 16, 2006.  (Id. at 41.)

---

[15] At the time of the hearing, Plaintiff was taking psychotropic medications
(Effexor, Klonopin, and Seroquel) as prescribed, and Lisinopril, Asprin, Triclor, Zocort,
Insulin, Humalog, and Prilosec.  (Id. at 36, 203.)

09cv01534

In her SSI and SSDI applications, as well as at the hearing, Plaintiff alleged she could not work because she has major depression, panic and anxiety attacks, and PTSD.  (Id. at 38.)  Plaintiff attributed her major depression symptoms and the increase in the number of her panic attacks to the death of her mother and her brother's threats to kick her out her mother's home.  (Id. at 35.)  In the early 1990's, Plaintiff began having panic attacks twice per week.  (Id. at 38.)  Plaintiff testified she still has panic attacks a couple times a week.  (Id. at 38-39.)  The symptoms of her panic attacks are her heart starts to beat fast, her mouth goes dry, she sweats and gets tunnel vision, and she wants to run.  (Id. at 39.)  The panic attacks last anywhere from a few hours to more than a day.  (Id.)  Plaintiff attributed her PTSD symptoms to a physically abusive eleven year relationship with her former boyfriend.  (Id. at 38.)  Plaintiff testified she ended her relationship with her former boyfriend in 1992 and immediately moved in with her mother.  (Id.)

Plaintiff also testified she could not perform her prior work as a psychiatric technician because she has memory and concentration problems.  (Id. at 42-44.)  Plaintiff stated she forgets her appointment times, bus pass, and backpack, and often loses her storage keys and clothes.  (Id. at 42.)   Plaintiff mentioned she has trouble with social and daily functioning because she does not like to be around people, and dislikes loud noises, yelling, arguing, and fighting.  (Id. at 39.)  She also does not like to be outside, even though she is homeless and spends the majority of her time outside.  (Id. at 39-40.)  Plaintiff said she seeks out places that are not full of people and has difficulty using public transportation by herself.  (Id. at 40, 44.)  Plaintiff also fears getting hurt at work because she got hurt at work once before.  (Id. at 44.)

**B.   Medical Expert Testimony**

Sidney Bolter, M.D., testified as a medical expert ("ME") at the administrative hearing held on July 23, 2008.  (Id. at 45-54.)  He testified the majority of Plaintiff's records were inadequate and the most complete mental status exam he reviewed was completed by Dr. Fijman.  (Id. at 45-46.)  Dr. Fijman's examination of Plaintiff yielded a

1  diagnosis of polysubstance dependence, chronic to severe, with mood disorder being

2  secondary to the polysubstance dependence.  (Id. at 46.)  Dr. Bolter testified the other

3  mental status examinations were of the "check off form" style and could not be used to

4  support his conclusion, citing to Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996).  (Id.

5  at 46-47.)  Dr. Bolter also stated there were repeated reports of methamphetamine and

6  marijuana abuse and that any episodes of decompensation "might very well be due to . .

7  . [drug] abuse."  (Admin. R. at 48-49.)   He indicated even if May 16, 2006 was the last

8  time Plaintiff used amphetamines, "it still would be having an effect on the examination."

9  (Id. at 46.)  Dr. Bolter concluded Plaintiff could perform simple repetitive tasks with no

10 public contact and minimal contact with supervisors.  (Id. at 49.)

11      During the hearing, Dr. Bolter was asked by Plaintiff's attorney to evaluate Dr.

12 Papp's mental status evaluation of Plaintiff.  (Id. at 50.)  Dr. Bolter concluded the

13 evaluation was problematic because it was "a conclusive statement."  (Id. at 51.)  Dr.

14 Bolter testified, "I can't do much with those forms because they're conclusive

15 statements.  They're likely to check off mental status with conclusive words . . . But

16 they're not enough to make a really good independent evaluation aside from the check

17 off."  (Id.)  Dr. Bolter stated the mental status evaluation form was an inadequate

18 summary of Dr. Papp's meetings with Plaintiff.  (Id.)

19 **C.   Vocational Expert Testimony**

20      Vocational expert ("VE") Mary Jesko, Ph.D., testified at the administrative hearing

21 held on July 23, 2008.  (Id. at 54-56.)  In response to a hypothetical question presented

22 by the ALJ, the VE testified that a younger individual, with fourteen years of education,

23 who has no severe physical limitations, and non-exertional limitations of "simple

24 repetitive tasks, nonpublic contact, dealing with coworker or supervisor interaction,"

25 would not be able to return to Plaintiff's past relevant work activities.  (Id. at 55.)

26 Plaintiff's past work as a psychiatric technician was classified as medium and skilled

27 and Plaintiff's current limitations required light or sedentary positions.  (Id. at 54.)

28 However, the VE testified Plaintiff could work as a small parts assembler, laundry folder,

or seam steamer.  (Id. at 55.)  The VE also responded to one hypothetical question posed by Plaintiff's attorney.  (Id. at 56.)  The VE testified an individual who missed more than three days of work per month would not be able to sustain the three jobs she mentioned earlier.  (Id.)  However, the VE clarified if an individual missed three days of work or less per month, the individual could sustain any of those jobs.  (Id.)

## V.  THE ALJ DECISION

After considering the record, ALJ Carletti made the following findings:

. . . .

2.   The claimant has not engaged in substantial gainful activity since July 1, 2005, the alleged onset date [citations omitted].

3.   The claimant has the following severe impairments: anxiety disorder and post-traumatic stress disorder (PTSD) [citations omitted].

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in [the Social Security Regulations] [citations omitted].

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work.  The claimant can also perform simple repetitive task *(sic)* with minimum interaction with coworkers and supervisors and no contact with the public.

6.   The claimant is unable to perform any past relevant work [citation omitted].

. . . .

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform [citations omitted].

11.  The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2005 through the date of this decision [citation omitted].

(Id. at 13-21.)

## VI.  STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show: (1) he or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant

incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C. § 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  Id. Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

**A.     Sequential Evaluation of Impairments**

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled."  The five steps are as follows:  (1) Whether the claimant is presently working in any substantial gainful activity.  If so, the claimant is not disabled. If not, the evaluation proceeds to step two.  (2) Whether the claimant's impairment is severe.  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments.  If so, the claimant is disabled.  If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work she has done in the past.  If so, the claimant is not disabled.  If not, the evaluation continues to step five.  (5) Whether the claimant is able to do any other work.  If not, the claimant is disabled.  Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled.  20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

**B.     Judicial Review**

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Commissioner's final decision should not be disturbed unless:  (1) The ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole.  Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir.

09cv01534

2000).  Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citing Andrews, 53 F.3d at 1039).  Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed.  Vasquez, 572 F.3d at 591 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the SSA for further proceedings.  Id.

## VII.  DISCUSSION

Plaintiff contends the ALJ's decision to deny her SSI benefits is not supported by substantial evidence.  Plaintiff makes the following arguments: First, the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Papp's treating psychiatrist opinion; second, the ALJ failed to properly consider the opinions of Plaintiff's treating physicians Drs. Zink and Chavez; third, the ALJ failed to reject Plaintiff's testimony with specific, clear, and convincing reasons; fourth, the ALJ failed to adequately consider Plaintiff's son's lay testimony; and fifth, the ALJ erred in failing to consider medical evidence of Plaintiff's bilateral carpal tunnel syndrome.

## A.    The ALJ Did Not Meet His Burden of Articulating Specific and Legitimate Reasons for Rejecting Plaintiff's Treating Physicians' Opinions

Plaintiff first contends the ALJ failed to properly consider the opinions of Plaintiff's treating physicians, Drs. Papp, Zink, and Chavez, and rejected their opinions without providing specific, clear, and convincing reasons.  (Pl.'s Mem. at 20-24.)  In response,

1    Defendant contends the ALJ properly rejected the opinions of Plaintiff's treating

2    physicians in favor of the opinion of Dr. Bolter, the Medical Expert ("ME").  (Def.'s Opp'n

3    at 7-11.)

4         Ninth Circuit case law distinguishes among the opinions of three types of

5    physicians: "(1) those who treat the claimant (treating physicians); (2) those who

6    examine but do not treat the claimant (examining physicians); and (3) those who neither

7    examine nor treat the claimant (nonexamining physicians)."  Lester v. Chater, 81 F.3d

8    821, 830 (9th Cir. 1996).  "As a general rule, more weight should be given to the opinion

9    of a treating source than to the opinion of doctors who do not treat the claimant."  Id.

10   (citing Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987)).  If the treating physician's

11   opinion is uncontroverted, the ALJ may reject the opinion only by articulating clear and

12   convincing reasons.  Andrews, 53 F.3d at 1041.  "Where . . . a nontreating source's

13   opinion contradicts that of the treating physician but is not based on independent clinical

14   findings, or rests on clinical findings also considered by the treating physician, the

15   opinion of the treating physician may be rejected only if the ALJ gives specific,

16   legitimate reasons for doing so based on substantial evidence in the record."  Id. (citing

17   Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  If, on the other hand, the

18   opinion of the claimant's treating physician is contradicted, and the opinion of a

19   nontreating source is based on independent clinical findings that differ from those of the

20   treating physician, the opinion of the nontreating source may itself constitute substantial

21   evidence, and it is then solely the province of the ALJ to resolve the conflict.  Id. (citing

22   Magallanes, 881 F.2d at 751).

23        The ALJ is responsible for resolving ambiguities and inconsistencies in the

24   medical testimony.  Andrews, 53 F.3d at 1039.  Furthermore, determining whether

25   inconsistencies are material, or are in fact inconsistencies at all, falls within the ALJ's

26   responsibility.  Morgan v. Commissioner, 169 F.3d 595, 603 (9th Cir. 1999).  The ALJ

27   must offer more than his conclusions and "must set forth his own interpretations and

28   explain why they, rather than the doctors' are correct."  Embrey v. Bowen, 849 F.2d

09cv01534

418, 421-22 (9th Cir. 1988).  Merely stating that medical opinions are not supported by sufficient objective findings does not achieve the level of specificity required.  Id. at 421. The ALJ must set out a "detailed thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings."  Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir. 1986).

Here, three treating physicians, Drs. Papp, Chavez, and Zink, offered their opinions regarding Plaintiff's medical condition, which were reviewed and deemed inadequate by Dr. Bolter, the ME, who testified at the administrative hearing.  (Id. at 45-47.)  In doing so, the ME contradicted portions of the treating physicians' opinions and concluded Plaintiff had an anxiety disorder and PTSD.  (Id. at 18-19, 49.)  The ALJ, in his analysis, briefly summarized the reports of Drs. Papp, Chavez, and Zink but impliedly rejected them by ignoring their opinions.  (See id. at 17-18.)  The ALJ instead relied on the testimony of the ME, concluding Plaintiff had the severe impairments of anxiety disorder and PTSD, but deemed she was not disabled within the meaning of Social Security regulations.  (Id. at 15-16.)

### a.    Dr. Papp

Dr. Papp concluded Plaintiff had a Panic Disorder with Agoraphobia and suffered moderate limitations in activities of daily living, marked limitations in social functioning, marked limitations in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration.  (Id. at 518.)  He assigned Plaintiff a GAF of 45, based on her "depressed mood, flat affect, panic attacks and agoraphobia."[16]  (Id. at 515-516.)  He noted that even a minimal increase in mental demands or any change in environment would be likely cause Plaintiff to decompensate and opined Plaintiff would likely be absent from work more than three times a month due to her "irrational fears of having panic attacks, severe anxiety, [and] fear of interacting with others."  (Id. at 517-518.)  He also observed that Plaintiff was stabilized on medication, but her response to treatment was inconsistent.  (Id.)

---

[16]  See supra, note 5, for GAF of 41-50.

1       The ALJ briefly summarized Dr. Papp's report, but did not directly evaluate or

2   indicate what weight, if any, he gave to the treating physician's opinions.  Instead, he

3   impliedly rejected Dr. Papp's opinions and relied on the ME's testimony that Dr. Papp's

4   report was "inadequate and . . . not supportive."  (see id. at 18-19.)  Rather than

5   explaining the inadequacies of Dr. Papp's report, the ALJ incorporated by reference the

6   ME's analysis into his own analysis.  (Id. at 19.)  This was not a sufficient rejection of Dr.

7   Papp's opinion under the relevant authority and constitutes legal error.  See Hammock

8   v. Bowen, 879 F.2d 498, 502 (9th Cir. 1989) (ALJ's failure to offer any reasons as to

9   why he disregarded the claimant's treating physician's opinions was legal error).  Given

10   Dr. Papp's role as Plaintiff's most recent treating physician, his opinion warranted more

11   consideration and discussion than provided in the ALJ's decision.  See e.g., 20 C.F.R. §

12   404.1527 ("Generally, we give more weight to opinions from your treating sources, since

13   these sources are likely to be the medical professionals most able to provide a detailed,

14   longitudinal picture of your medical impairment(s) and may bring a unique perspective

15   to the medical evidence that cannot be obtained from the objective medical findings

16   alone . . . .").

17       Additionally, it was insufficient for the ALJ to rely on the ME's review of the

18   evidence in the record to decide to give more weight to the ME's opinion than to the

19   opinion of Dr. Papp.  The ME's opinion could serve as substantial evidence only if it was

20   based on independent clinical findings or was supported by and consistent with other

21   evidence in the record.  See Andrews, 53 F.3d at 1041.  The opinion of the ME, who did

22   not examine Plaintiff, was not based on his own independent clinical findings and was

23   not consistent with other evidence in the record.  The ME's opinion alone, therefore,

24   could not constitute substantial evidence.  See id.

25       **b.   Drs. Chavez and Zink**

26       Dr. Chavez concluded Plaintiff had Panic Attacks with Agoraphobia and

27   Dependency Traits, and suffered no restrictions in activities of daily living, but had

28   extreme difficulties in maintaining social functioning, moderate to marked difficulties in

maintaining concentration, persistence, and pace, and one or two episodes of

decompensation.  (Admin. R. at 392.)   He opined Plaintiff would likely be absent from

work more than three times a month due to her impairments and would have difficulty

working at a regular job on a sustained basis for fear of having panic attacks or

excessive mood disturbance.  (Id. at 391.)

Dr. Zink concluded Plaintiff had Major Depressive Disorder, recurrent and

severe, without psychotic features, and Methamphetamine Dependence in full

remission, and suffered moderate limitations in activities of daily living, moderate

limitations in social functioning, moderate limitations in maintaining concentration,

persistence, or pace, and one or two repeated episodes of decompensation of extended

duration.  (Id. at 363-64.)  He concluded Plaintiff would likely be absent from work more

than three times a month due to her impairments, "[s]econdary to severity of

depression, and frequent panic attacks, [and that Plaintiff] may not be able to function

even on a part-time basis."  (Id. at 363.)

The ALJ referenced Dr. Chavez's report by only exhibit number and briefly

summarized Dr. Zink's report in Plaintiff's medical history.  He did not evaluate either

physician's opinions, but again, implicitly rejected their opinions or findings by ignoring

them.  (See id. at 18-19.)  The ALJ failed to explain his reasoning for rejecting the

opinions of Dr. Chavez and Dr. Zink and instead adopted without explanation the ME's

opinion.[17]  (Id. at 19.)  This was not a sufficient rejection of Drs. Chavez's and Zink's

opinions under the relevant authority and constitutes legal error.  See Hammock, 879

F.2d at 502.

It was also insufficient for the ALJ to rely on the ME's review of the evidence to

decide to give more weight to the ME's opinion than to the opinions of Dr. Chavez and

Dr. Zink.  Moreover, the opinion of the ME, who did not examine Plaintiff, was still not

---

[17] During the administrative hearing, the ME rejected the mental status evaluation forms completed by Dr. Chavez and Dr. Zink, citing to Crane v. Shalala.  Crane, 76 F.3d at 253 (holding it was proper for the ALJ to reject evaluations that are presented in a check-off form and do not contain any explanation of the bases of the conclusions).

based on independent clinical findings and was not consistent with the other evidence in the record.  The ME's opinion alone could not constitute substantial evidence.  See Andrews, 53 F.3d at 1041.

### c.    Remand is Appropriate

In sum, the record does not support the ALJ's implicit rejection of, or failure to adequately discuss, the opinions of Drs. Papp, Chavez, and Zink.  Moreover, the ALJ erred by not resolving the inconsistencies in the record regarding Plaintiff's mental diagnoses and functional limitations.  The Court finds, absent a proper rejection or discounting of Plaintiff's treating doctors' opinions, the opinions of Drs. Papp, Chavez, and Zink should have been considered at the ALJ's step three analysis of whether Plaintiff's impairments "medically equaled" or "functionally equaled" a disability listed in the Listings of Impairments.  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded."  Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).  Accordingly, remand is proper.  See McAllister v. Sullivan, 888 F.2d 599, 603-04 (9th Cir. 1989).  The Court, therefore, recommends Plaintiff's motion for summary judgment on this issue be GRANTED, and the ALJ, upon remand, be required to provide further consideration of the opinions of Drs. Papp, Chavez, and Zink.

**B.    The ALJ Failed to Articulate Clear and Convincing Reasons for Finding Plaintiff's Subjective Symptom Testimony Not Credible**

Plaintiff next contends the ALJ failed to reject Plaintiff's testimony with specific, clear, and convincing reasons.  (Pl.'s Mem. at 24-26.)  Defendant counters by arguing the ALJ provided legally sufficient reasons for finding Plaintiff's testimony less than credible.  (Def's. Opp'n at 11-14.)

In determining a claimant's residual functional capacity, the ALJ must consider all relevant evidence in the record, including medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th

09cv01534

Cir. 2006) (citing SSR 96-8p, 1996 WL 374184, at *5).  "Careful consideration must be

given to any available information about symptoms because subjective descriptions

may indicate more severe limitations or restrictions than can be shown by objective

medical evidence alone."  Id. (citing SSR 96-8p).  An ALJ may not disregard a

claimant's testimony regarding her subjective symptoms solely because it is not

substantiated affirmatively by objective evidence.  Robbins, 466 F.3d at 883.  "[T]o

discredit a claimant's testimony when a medical impairment has been established, the

ALJ must provide 'specific, cogent reasons for the disbelief.'"  Orn v. Astrue, 495 F.3d

625, 635.

Here, the ALJ found Plaintiff's medically determinable impairments could

reasonably be expected to produce her alleged symptoms, but found her testimony

regarding the intensity, persistence, and limited effects of her symptoms, as well as her

testimony regarding her inability to work, not credible, reasoning:

First, the analysis of the claimant's mental impairments, supra, is
incorporated by reference herein.

Second, the claimant testified to no drug use, but a treating doctor notes
occasional use recently [citation omitted].

Third, on July 6, 2005 treatment records reported the claimant was given a
GAF of 60, which are moderate symptoms on discharge from the hospital
[citation omitted].

Fourth, on January 4, 2006, a mental status examination reported the
claimant was oriented to person, place, day and month.  The claimant was
clean, well nourished with normal speech.  Her thought process was
coherent, and she was cooperative.  The claimant's mood, memory and
judgment were normal.  The claimant was given a (GAF) of 50, which are
moderate symptoms [citations omitted].

Fifth, on May 16, 2006, Dr. Fijman gave the claimant a GAF of 55 to 68,
which are moderate to mild symptoms.  Based on the claimant's
examination, Dr. Fijman opined the claimant had no functional limitations
from a psychiatric standpoint [citation omitted].

Sixth, the objective medical evidence does not show pathology reasonably
likely to produce the debilitating symptoms alleged.

Seventh, State Agency determined the claimant had mild restriction of
daily living, moderate difficulties in maintaining social functioning, mild
difficulties in maintaining concentration, persistence or pace and no
episodes of decompensation, each of extended duration [citation omitted].

> Consequently, the allegations for a more restricted residual functional capacity are not wholly credible.

(Admin. R. at 19-20.)[18]  The ALJ, however, failed to discredit Plaintiff's testimony regarding her established medical impairments.  Except for reason two, each reason concerned the lack of objective medical evidence supporting Plaintiff's psychological complaints.  Lack of objective medical evidence alone does not sufficiently discredit subjective symptom testimony.  See Robbins, 466 F.3d at 883.

Furthermore, the ALJ's second reason for finding Plaintiff's testimony not credible is unsupported by the record.  The ALJ found Plaintiff "testified to no drug use, but a treating doctor notes occasional use recently." (Admin. R. at 19.)  Plaintiff, however, did not testify she had no history of drug use, but rather that she last used drugs on May 16, 2006.  (Id. at 41.)  Regardless, the ALJ's conclusory statement failed to provide a meaningful explanation as to why Plaintiff's testimony of no drug use undermined her credibility.  Robbins, 466 F.3d at 884 (holding when an ALJ provides a "facially legitimate reason" for an adverse credibility finding, a reviewing court cannot assess its legitimacy if there is no meaningful explanation).  In order for Plaintiff's drug use to constitute a clear and convincing reason to find Plaintiff not credible, the ALJ must explain with specificity why it should serve as a basis to discredit Plaintiff's subjective symptom testimony.  See e.g., Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).

None of the above listed reasons sufficiently addresses why Plaintiff's testimony regarding her mental impairments is not credible.  The Court recommends Plaintiff's motion for summary judgment on this issue be GRANTED, and the ALJ, upon remand, be required to reconsider Plaintiff's credibility.

**C.   The ALJ Erred in Rejecting Plaintiff's Son's Third Party Lay Testimony**

Plaintiff also contends the ALJ failed to adequately consider Plaintiff's son's lay testimony and erred in finding Mr. Wader's testimony inconsistent with objective medical

---

[18] In reason one, the ALJ incorporated by reference his summarized analysis of Plaintiff's medical history of mental impairments, but failed to explain why Plaintiff's testimony was not credible.  (Admin. R. at 19.)

1   evidence.  (Pl.'s Mem. at 26-27.)  In opposition, Defendant contends Mr. Wader's third

2   party testimony was inconsistent with Drs. Fijman and Bolter's opinions and argues the

3   inconsistency was a sufficient basis for rejecting Mr. Wader's testimony. (Def.'s Opp'n at

4   14.)

5          In the Ninth Circuit, "the ALJ is required to account for all lay witness testimony in

6   the discussion of his or her findings."  Robbins, 466 F.3d at 885 (citing Lewis v. Apfel,

7   236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is

8   competent evidence that an ALJ must take into account, unless he or she expressly

9   determines to disregard such testimony and gives reasons germane to each witness for

10  doing so.")).  "[L]ay witness testimony as to a claimant's symptoms or how an

11  impairment affects ability to work is competent evidence . . . and therefore cannot be

12  disregarded without comment."  Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)

13  (emphasis in original).  "[W]here the ALJ's error lies in failure to properly discuss

14  competent lay testimony favorable to the claimant, a reviewing court cannot consider

15  the error harmless unless it can confidently conclude that no reasonable ALJ, when fully

16  crediting the testimony, could have reached a different disability determination."  Stout

17  v. Comm'r, 454 F.3d 1050, 1056 (9th Cir. 2006).

18         Here, Plaintiff's son, Joseph Wader, completed one "Function Report Adult -

19  Third Party" form on February 22, 2006, presumably at the behest of the SSA.  (Admin.

20  R. at 151-58.)  Mr. Wader reported he needed to remind Plaintiff to take care of her

21  personal needs and stay on task, and that Plaintiff could not go out alone for "fear of

22  others and the outside." (Id. at 152-153, 158.)  Mr. Wader also reported Plaintiff had

23  trouble remembering dates, keeping records, following directions, or paying attention for

24  more than a short period of time but could prepare simple meals, wash dishes, do

25  laundry, sweep, shop for food and clothes, read, watch television and movies, and

26  spend time with friends and family.  (Id. at 153-58.)  Such testimony, if fully credited,

27  does support a conclusion that Plaintiff might be unable to work.

28  / /

09cv01534

However, in his decision, the ALJ concluded:

> "[T]he claimant's son did not establish that the claimant is disabled.  Since he is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the intensity of unusual moods or mannerisms, the accuracy of her [sic] report is questionable. . . [S]ignificant weight cannot be given to the claimant's son because . . . it is not consistent with the preponderance of the opinions and observations by medical doctors in this case."

(Id. at 18.)  "[F]riends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition."  Dodrill, 12 F.3d at 918-99.  The ALJ may not reject lay witness testimony simply because "the claimant's alleged symptoms are unsupported by her medical records."  Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996).

Here, the ALJ rejected Mr. Wader's testimony for being inconsistent with objective medical evidence.  (Admin. R. at 18.)  An ALJ may reject a lay witness's testimony for being inconsistent with objective medical evidence; however, in doing so he must give reasons that are germane to the specific witness.  Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005); Dodrill, 12 F.3d at 919.  Not being medically trained is not a germane reason to discredit Mr. Wader's testimony concerning Plaintiff's symptoms and daily activities.  Bruce v. Astrue, 557 F.3d 1113, 1116 (9th Cir. 2009) ("A lay person . . . though not a vocational or medical expert, was not disqualified from rendering an opinion as to how [the claimant's] condition affects . . . ability to perform basic work activities.").

In sum, the ALJ's rejection of Mr. Wader's lay witness testimony was not made for a germane reason specific to Mr. Wader.  Accordingly, the Court recommends Plaintiff's motion for summary judgment on this issue be GRANTED, and the ALJ, upon remand, be required to reconsider Mr. Wader's lay testimony regarding Plaintiff's symptoms and ability to work.

/ /

/ /

/ /

09cv01534

**D.     Plaintiff Failed to Establish Bilateral Carpal Tunnel Syndrome as a Severe Impairment**

Plaintiff next contends the ALJ erred in failing to consider medical evidence of Plaintiff's bilateral carpal tunnel syndrome.  (Pl.'s Mem. at 27.)  In response, Defendant contends Plaintiff failed to demonstrate how her carpal tunnel syndrome significantly limited her physical ability to perform basic work activities.  (Def's Opp'n at 15.)

The ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  Smolen, 80 F.3d at 1288.  However, the burden is on the claimant to demonstrate he or she has an impairment that significantly limits his or her ability to perform basic work activities.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).  The ALJ, in his decision, did not mention the bilateral carpal tunnel findings and presumably did not find the condition to be severe.  (Admin. R. at 456-57.)  Plaintiff's carpal tunnel condition was documented briefly by Dr. Rudolph, who treated her with wrist splints and injections which improved her symptoms.  (Id.)  Moreover, Plaintiff, in her SSI and SSDI applications and during the social security proceedings, failed to allege her carpal tunnel syndrome was a severe impairment.  (Id. at 24-57.)  When specifically asked during the hearing if she had physical impairments that limited her ability to work, Plaintiff only mentioned uncontrolled diabetes and glaucoma.  (Id. at 37.)  "The claimant first must bear the burden . . . of showing that [she] has a medically severe impairment or combination of impairments."  Bowen, 482 U.S. at 146 n.5.

Plaintiff failed to demonstrate how her bilateral carpal tunnel syndrome was a severe impairment.  Accordingly, the Court recommends Plaintiff's motion for summary judgment on this issue be DENIED.

**E.     Plaintiff is Not Entitled to a Judicial Award of Benefits**

Plaintiff's final contention is the ALJ improperly failed to find Plaintiff disabled and is, therefore, entitled to a judicial award of disability benefits.  (Pl.'s Mem. at 27-30.)  Defendant contends Plaintiff is not so entitled.  (Def.'s Opp'n at 16.)

/ /

1        The Ninth Circuit has held a remand for payment of benefits is appropriate only

2   when the Court determines that "(1) the ALJ failed to provide legally sufficient reasons

3   for rejecting the evidence; (2) there are no outstanding issues that must be resolved

4   before a determination of disability can be made; and (3) it is clear from the record that

5   an ALJ would be required to find the claimant disabled were such evidence credited."

6   <u>Benecke v. Barnhart</u>, 379 F.3d 587, 593 (9th Cir. 2004).  This Court has recommended

7   on remand the ALJ's reconsider the treating physicians' opinions, Plaintiff's credibility,

8   and Mr. Wader's lay witness testimony.  Accordingly, these outstanding issues must be

9   resolved before a determination of disability can be made.  <u>Id.</u>  Plaintiff is not entitled to

10  a judicial award of benefits.  The Court recommends Plaintiff's motion for summary

11  judgment on this issue be DENIED.

12  **VIII.  CONCLUSION**

13       For the reasons set forth above, Plaintiff's motion for summary judgment should

14  be **GRANTED IN PART** and **DENIED IN PART**, Defendant's cross-motion for summary

15  judgment should be **GRANTED IN PART** and **DENIED IN PART**, and the case should

16  be remanded for further proceedings.

17       This report and recommendation will be submitted to the Honorable Anthony J.

18  Battaglia, United States District Judge assigned to this case, pursuant to the provisions

19  of 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve

20  a copy on all parties on or before **August 23, 2011**.  The document should be captioned

21  "Objections to Report and Recommendation."  Any reply to the Objections shall be

22  served and filed on or before **August 30, 2011**.  The parties are advised that

23  failure to file objections within the specified time may waive the right to appeal the

24  district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

25       **IT IS SO ORDERED**.

26  DATED: August 9, 2011

27

28                            Jan M. Adler
                          U.S. Magistrate Judge

09cv01534